Opinion
 

 BARON, J.
 

 In this case we are called on to resolve the issue of whether and under what circumstances a developer’s failure to commence construction of subdivision improvements will relieve a surety of its obligation to pay for such improvements under a performance bond. We conclude that where the local governing authority does not revoke the final subdivision map or cause the parcel to revert to acreage and development of the property is proceeding in accordance with the final map, the surety’s obligation remains in full force and effect.
 

 Background
 

 In February of 1990, the City of Los Angeles (the City) entered into a subdivision improvement agreement with Dale Leibert to create three parcels at 9755 Shoup Avenue, Chatsworth, California. “For, and in consideration of the approval of the final map of that certain division of land,” Leibert agreed to construct and install “all public improvements required in and adjoining and covered by the final map which are shown on plans, profiles and specifications, previously supplied to the City Engineer . . . .” The estimated cost of completion of public improvements was $126,000. The work was to be finished within 24 months of the date the final map was filed.
 

 
 *380
 
 Leibert was required by the subdivision agreement to file or deposit with the City “a good and sufficient Improvement Security in accordance with the provisions of Section 17.08G of the Municipal Code of the City, in an amount equal to or greater than the estimated cost of construction and installation of the required improvements . . . .” If Leibert “neglect[ed], refuse[d] or fail[ed] to prosecute the required work with such diligence as to insure its completion within the time specified herein, or within such extension of said time as may have been granted by the City Engineer or by the Board, or both,” or if Leibert “neglect[ed], refuse[d] or fail[ed] to perform satisfactorily any of the provisions of the improvement construction permit, plans and profiles, or specifications, or any other act required under this agreement and contract,” the City could declare the agreement in default and “[immediately upon a declaration of default, [Leibert] and Surety shall be liable to City for the cost of construction and installation of the public improvements and for costs and reasonable expense and fees, including reasonable attorneys’ fees incurred in enforcing this agreement and Contract.” The City thereafter approved the final map, known as Parcel Map L.A. No. 6309, on November 20, 1990.
 

 The required surety bond, obtained from Amwest Surety Insurance Company in return for a $2,100 premium, bound Amwest to pay the City $126,000 unless the following condition was met: “The Condition of the foregoing obligation is such that Whereas the Principal has entered or is about to enter into the annexed agreement with the City, pursuant to the authority of an act of the Legislature of the State of California known as the ‘Subdivision Map Act’ . . . ; and pursuant to the provisions of Article 7 of Chapter 1, and Sections 62.105 through 62.117, inclusive, of the Municipal Code of the CITY, as amended,[
 
 1
 
 ] for the construction and installation of certain public improvements in accordance with the terms and conditions stipulated in said agreement, and is required by the City to give this bond in
 
 *381
 
 connection with the execution of said agreement as a contract for approval of that certain division of land known as: Parcel Map L.A. No. 6309[.] [¶] Now, Therefore, if the above bounden Principal, his or its heirs, executors, administrators, or assigns, shall in all things stand to and abide by, and well and truly keep and perform the covenants, conditions and provisions in said annexed agreement and any alteration thereof made as therein provided, on his or their part, to be kept and performed at the time and in the manner therein specified, and in all respects according to their true intent and meaning, and shall indemnify and save harmless the City, its officers, agents and employees, as therein stipulated, then this obligation shall become null and void; otherwise, it shall be and remain in full force and effect.”
 

 Leibert began to undertake the improvements, obtaining soil to perform some of the grading work and relocating utility poles.
 
 [2]
 
 However, before he could make significant progress, he ran out of funds and lost ownership of the property through judicial foreclosure to First Security Thrift Company. Dennis Zisfain purchased the property from First Security in September 1994. At the time of purchase, Zisfain relied on the City’s intention to go against the surety bond to pay for the improvements, although he was aware that Amwest intended to dispute its obligation. Zisfain intends to develop the property in accordance with the final subdivision map, but he is not a party to any agreement with the City and is under no obligation to construct any public improvements.
 

 After notifying Amwest that bond default proceedings would be initiated, the City declared the bond in default on November 20, 1995. The lawsuit was filed January 9, 1996. Amwest cross-claimed against Zisfain for “equitable indemnity” based on unjust enrichment.
 

 The case was tried to the court without a jury on mostly uncontested facts. The City’s sole witness, Roger Ketterer of the bureau of engineering, testified that sometimes the City allowed property to revert to acreage and released the bond where a permit covering a single family dwelling expired without any work having been done, because in that case the owner received
 
 *382
 
 no benefit from the City. He distinguished the present case on the ground that the owner had received a benefit—the benefit of the filing of the subdivision map. He testified that reversions to acreage, when done, were usually requested by the owner, and often reversions were conditioned on making some concessions to the City.
 
 [3]
 

 The parties and the court were in agreement that the question presented was essentially one of law. They focused on three relevant authorities which discussed the obligations of a surety on a performance bond in the context of a subdivision improvement agreement:
 
 County of Yuba
 
 v.
 
 Central Valley Nat. Bank, Inc.
 
 (1971) 20 Cal.App.3d 109 [97 Cal.Rptr. 369],
 
 City of Sacramento
 
 v.
 
 Trans Pacific Industries, Inc.
 
 (1979) 98 Cal.App.3d 389 [159 Cal.Rptr. 514], and an unpublished appellate court opinion involving the same parties,
 
 City of Los Angeles
 
 v.
 
 Amwest Surety Ins. Co.
 
 (June 9, 1993) B068109.
 
 [4]
 
 As is discussed in greater detail below, the holding in the former was in favor of the surety, whereas the holding in the latter was in favor of the cities for whom the performance bonds had been issued. After reviewing the stipulated facts and the authorities, the trial court concluded that the present case was governed by
 
 County of Yuba,
 
 and found that a condition of Amwest’s obligation under the bond was that the work on the property must have been commenced by Leibert, that the work performed by Leibert was de minimis, that the act of reverting the property to its prior condition is a ministerial act, that there was nothing preventing the property from being reverted back to its original condition, and that there was a failure of consideration. From a judgment in favor of Amwest, including attorney fees, the City appeals.
 

 Discussion
 

 We start with a discussion of the relevant authority. In
 
 County of Yuba
 
 v.
 
 Central Valley Nat. Bank, Inc., supra,
 
 20 Cal.App.3d 109, a county brought suit against a bank following the bank’s refusal to pay pursuant to an instrument of credit issued by the bank. The county had executed a subdivision agreement with a developer and the instrument of credit was filed to secure the faithful performance of improvements on the land. No one else came forward to complete the project, and, as of the date of the trial, the parcel remained unimproved agricultural land. The trial court had found that an implied condition of the instrument of credit was that the bank’s liability would arise only if work were actually commenced on the parcel. The issue
 
 *383
 
 on appeal was “whether [the bank] remains liable to [the county] in the absence of commencement of any development of [the parcel] or any construction of the improvements therein.” (20 Cal.App.3d at p. 112, fn. omitted.)
 

 The Court of Appeal in
 
 Yuba
 
 agreed with the trial court, giving three reasons for its holding. First, “. . . the language of the instrument of credit executed by [the bank] indicate[d] that the parties intended to provide security for full completion of improvements whose construction had already begun.”
 
 (County of Yuba
 
 v.
 
 Central Valley Nat. Bank, Inc., supra,
 
 20 Cal.App.3d at p. 112.) Second, “to the extent that these [contractual] provisions do not clarify whether ‘completion’ necessarily presumes initial commencement of construction, the record contains the uncontradicted testimony of [the developer’s] president Ortiz that he communicated his belief to County surveyor Mlcoch that the property would merely revert to acreage under the instrument of credit if construction did not begin.”
 
 (Ibid.,
 
 fn. omitted.)
 
 [5]
 
 Third, “. . . since the purpose [of] requiring security for street improvement work is to insure faithful performance of a subdivider’s obligation to place streets in a proper condition for use by the public [citations], no purpose is served by construing a security instrument to relate to construction of streets where development of neither the subdivision nor the streets has ever commenced. [¶] In this vein it may also be observed that [the county’s] interest in the streets and easements offered for dedication was necessarily limited by the conditional nature of its acceptance thereof, which depended for finality upon a subsequent acceptance after satisfactory completion of the street improvements. [Citations.] This fact is demonstrated by the subdivision contract executed by [the county] and [the developer]. [¶] . . . [T]he underlying contract. . . demonstrates that the sole basis for the relationship between [the county], [the developer] and [the bank] was the development of [the parcel] as a residential subdivision. All of the parties’ transactions must therefore be construed with reference to this basic purpose.” (20 Cal.App.3d at pp. 112-113.)
 

 County of Yuba
 
 was distinguished in
 
 City of Sacramento
 
 v.
 
 Trans Pacific Industries, Inc., supra,
 
 98 Cal.App.3d 389. There, the city and the,developer entered into a written subdivision agreement for the development of a 33-acre lot under which the developer agreed to construct all public improvements, including streets, sidewalks, curbs, gutters, storm drains, lighting, sewage and water lines, etc. Trans Pacific issued a bond guaranteeing
 
 *384
 
 performance. The developer divided the lot into eight parcels and apparently began construction on some of them. Thereafter, it sold four of the eight parcels, all of which were in an undeveloped state, to a second developer who erroneously believed that the water and street lighting improvements were or would be complete. After learning that the original developer did not intend to complete improvements on the transferred parcels, the second developer entered into an agreement with the city whereby the second developer agreed to construct all the improvements on the four undeveloped parcels in exchange for the city’s promise to reimburse it from any judgment recovered from Trans Pacific under the performance bond.
 

 On appeal from a judgment in favor of the city, Trans Pacific contended that in light of the agreement with the second developer, nothing was owed under the performance bond because the city suffered no damages. The court disagreed, concluding that the damages were the cost of bringing the balance of the lot into compliance with the contract by installing the bargained-for improvements, and that the damages did not “magically disappear” when it entered into the agreement with the second developer.
 
 (City of Sacramento
 
 v.
 
 Trans Pacific Industries, Inc., supra,
 
 98 Cal.App.3d at p. 397.) The court distinguished
 
 County of Yuba
 
 on the grounds that “. . . there is no showing herein of any unfulfilled condition precedent to the surety’s obligation to pay,” and that “[a]lthough the county [in
 
 County of
 
 Yuba] was suing to collect on a bond to guarantee performance of the builder’s obligation to construct and dedicate certain public improvements if in fact he built at all on the land, there is no indication that the county had any need, or any intention, to use any money recovered in the lawsuit to install the improvements. Since the land was still uninhabited farmland, there was no need thereon for roads, easements, or rights of way. [Citation.] In effect, a forfeiture was involved. [Citation.] Here, in contrast, development had commenced on some of the parcels, and was planned on the rest. A palpable need existed for the needed improvements to be constructed on [the second developer’s] land. Judgment in [the city’s] favor did not constitute a forfeiture, but rather paid for [the second developer’s] performance of [Trans Pacific’s] unfulfilled obligations.” (98 Cal.App.3d at p. 398.)
 

 From our review of the relevant authorities, we believe that the trial court was wrong to rely on
 
 County of Yuba.
 
 The court in
 
 County of Yuba
 
 based its opinion on the specific facts of the case. The wording of the instrument of credit stated that monies were pledged “ ‘to meet the performance of completed street improvements’ ” and that the bank would pay said sum “ ‘for the completion of said improvements.’” (20 Cal.App.3d at p. 112.) That language, together with the uncontradicted testimony of the developer’s president that the property would revert if construction did not commence,
 
 *385
 
 led to the court’s finding that there was an underlying presumption of initial commencement of construction before the bank’s obligation to pay could arise.
 
 (Id.
 
 at pp. 111-112.) The instrument here put the parties on a different footing. The bond stated that Amwest’s obligation to pay money was absolute unless Leibert “well and truly ke[pt] and perform[ed] the covenants, conditions and provisions” of the subdivision improvement agreement. As in
 
 City of Sacramento,
 
 “there [was] no showing herein of any unfulfilled condition precedent to the surety’s obligation to pay.” (98 Cal.App.3d at p. 398.)
 

 A second crucial difference was also discussed in
 
 City of
 
 Sacramento: “[T]here [was] no indication [in
 
 County of
 
 Yuba] that the county had any need, or any intention, to use any money recovered in the lawsuit to install the improvements. Since the land was still uninhabited farmland, there was no need thereon for roads, easements, or rights of way. [Citation.]”
 
 (City of Sacramento
 
 v.
 
 Trans Pacific Industries, Inc., supra,
 
 98 Cal.App.3d at p. 398.) In the present case, the City fully intends to utilize the moneys obtained from Amwest to construct the improvements set forth in the subdivision improvement agreement, and those improvements will benefit the homes planned by Zisfain. The funds will not go into the general coffers of the City to be used for purposes unrelated to the parcel.
 

 The final distinction is that here, as in
 
 City of Sacramento
 
 and unlike the situation in
 
 County of Yuba,
 
 the parcel has not reverted to acreage. The trial court erroneously concluded that the property must eventually revert to acreage as the result of a “ministerial” act, and that this reversion would result in a “failure of consideration.” We agree that the approval of the final subdivision map was the consideration given by the City for the promise to construct the improvements. However, the governing statutory provisions (Gov. Code, § 66499.11 et seq.) make clear that the decision to revert to acreage—to in effect revoke the final subdivision map—is a discretionary one. The legislative body “may” initiate proceedings for reversion to acreage and that acreage “may” revert if certain factors are in place and the legislative body finds that “[dedications or offers of dedication to be vacated or abandoned by the reversion to acreage are unnecessary for present or prospective public purposes . . . .” (Gov. Code, §§ 66499.12, 66499.16, subd. (a).)
 

 “ ‘Ministerial projects as a general rule, include those activities defined as projects which are undertaken or approved by a governmental decision which a public officer or public agency makes upon a given state of facts in a prescribed manner in obedience to the mandate of legal authority. With these projects, the officer or agency must act upon the given facts without
 
 *386
 
 regard to his own judgment or opinion concerning the propriety or wisdom of the act although the statute, ordinance, or regulation may require, in some degree, a construction of its language by the officer. In summary, a ministerial decision involves only the use of fixed standards or objective measurements without personal judgment.’ [Citation.]” (60 Ops.Cal.Atty.Gen. 335, 345-346 (1977), quoting former 14 Cal. Admin. Code, § 15032; see Cal. Code Regs., tit. 25, § 6950.) The decision to revoke a final subdivision map and revert a parcel to acreage requires “personal judgment” concerning the “propriety or wisdom of the act” and is not made only through the use of “fixed standards” and “objective measurements.” We agree with the Attorney General’s opinion that “approval of a reversion to acreage under the Subdivision Map Act is a discretionary function.” (60 Ops.Cal.Atty.Gen.,
 
 supra,
 
 at p. 346.)
 

 Disposition
 

 The judgment in favor of Amwest is reversed. The case is remanded with directions to enter judgment for the City and for consideration of appropriate attorney fees and costs. The City is to recover its costs on appeal.
 

 Vogel (C. S.), P. J., and Epstein, J., concurred.
 

 Respondent’s petition for review by the Supreme Court was denied June 17, 1998.
 

 [1]
 

 Section 62.111(b)(1) of the Los Angeles Municipal Code states: “No class ‘B’ permit shall be issued unless the applicant shall first file with the City Engineer a good and sufficient bond, approved by the Board or its duly authorized representative. The bond shall be in an amount equal to the cost of the proposed work as estimated by the City Engineer. The bond shall contain a condition requiring the faithful performance and completion of the work for which the permit is issued, in accordance with the permit and the plans and specifications prepared therefor, as well as a condition requiring the performance of any work required to be performed pursuant to the provisions of Section 61.02 of this Code.” Los Angeles Municipal Code section 62.111(d)(1) goes on to state that “[w]henever a surety bond has been filed in compliance with this section, the Board is hereby empowered, in the event of any default on the part of the principal, to enforce collection, under such bond of all sums due and unpaid to the City as charges arising out of the issuance of the permit, and for any and all damages sustained by the City ... by reason of any failure on the part of the permittee to faithfully and properly to perform, in accordance with the permit and the plans and specifications, the work or improvement for which the permit was issued .... In the event of any such default on the part of the permittee, the Board may, at its option, cause all
 
 *381
 
 the required work to be done and surety upon the bond shall be firmly bound for the payment of all necessary costs thereof.” Under Los Angeles Municipal Code section 62.111(e)(1), “The term of each bond filed or posted pursuant to this section, shall begin upon the date of the filing or posting thereof and shall end upon the date of the completion, to the satisfaction of the City Engineer, of all the covered the
 

 [2]
 

 The trial court found that because the soil was obtained and dumped prior to the issuance of a grading permit, that the work performed in relocating the utility pole was the only work done in furtherance of constructing the improvements.
 

 [3]
 

 The trial court found this testimony “non-credible,” although it is unclear what effect, if any, this finding had on the outcome of the case. The court ultimately agreed with the witness that the process of reversion to acreage was “not automatic.”
 

 [4]
 

 The analysis undertaken by the court in
 
 City of Los Angeles
 
 v.
 
 Amwest Surety Ins. Co.
 
 was similar to that in
 
 City of Sacramento.
 
 Because it is an unpublished decision, we do not rely on it, even though it involved the same issue and the same two parties currently before us.
 

 [5]
 

 The court believed this factor distinguished the case from
 
 Stewart Title Co.
 
 v.
 
 Herbert
 
 (1970) 6 Cal.App.3d 957, 964 [96 Cal.Rptr. 631], which held that “the uncommunicated subjective belief of a contracting party is not competent evidence to prove the meaning of the contract.”