116 Cal.Rptr.2d 145 (2002)
95 Cal.App.4th 835
TOPSAIL COURT HOMEOWNERS ASSOCIATION, Plaintiff and Appellant,
v.
COUNTY OF SANTA CRUZ, Defendant and Appellant;
Soquel Creek Water District, Defendant and Respondent.
No. H022122.
Court of Appeal, Sixth District.
January 28, 2002.
As Modified on Denial of Rehearing February 26, 2002.
Review Granted May 1, 2002.
*146 Dale H. Dawson, Gerald D. Bowden, Dawson, Passafuime & Bowden, Scotts Valley, for Appellant Topsail Court Homeowners.
Samuel Torres, Jr., Santa Cruz County Counsel, and Rahn Garcia, Deputy County Counsel, for Defendant and Appellant County of Santa Cruz.
Bosso, Williams, Sachs, Atack & Gallagher, Robert E. Bosso and John M. Gallagher, Santa Cruz, for Defendant and Respondent Soquel Creek Water District.
MIHARA, J.
In 1992, appellant County of Santa Cruz (the County) approved a parcel map that *147 created a four-parcel subdivision. In 1995, respondent Soquel Creek Water District (SCWD) purchased one of the four parcels for the purpose of building a well and water treatment facility on the parcel. In 1997, the remaining three parcels were sold to individuals who now live in single family residences on these parcels. The owners of these three parcels are the members of appellant Topsail Court Homeowners Association (Topsail). In December 1999, Topsail petitioned for a writ of mandate. It sought to compel the County to issue a conditional certificate of compliance for SCWD's parcel based on the absence of compliance with the County's 1990 conditional approval of the proposed subdivision. Topsail also sought a writ of mandate compelling SCWD to comply with building and zoning laws with regard to its proposed well and water treatment facility.
In October 2000, the trial court issued a writ of mandate commanding the County to issue conditional certificates of compliance for all four parcels due to the absence of compliance with the 1990 conditional approval. The court refused to issue a writ of mandate requiring SCWD to comply with building and zoning laws because the court concluded that SCWD was exempt from building and zoning laws with regard to the planned well and water treatment plant.
Both Topsail and the County appeal from the court's judgment. The County asserts that the trial court erred in issuing a writ of mandate because Topsail's challenge to the legality of the parcels was barred by the statute of limitations. Topsail contends that the court should have ordered the issuance of unconditional certificates of compliance for the three parcels owned by its members, and it makes other challenges to the specifics of the court's writ regarding the legality of the parcels. Topsail also maintains that the trial court erred in finding that SCWD was exempt from zoning laws with respect to the planned well and water treatment facility. We conclude that the statute of limitations barred Topsail's challenge to the legality of the parcels. We also conclude that SCWD was not exempt from zoning laws with regard to the planned water treatment facility. Consequently, we reverse the trial court's judgment.

Factual Background
In March 1990, the County conditionally approved an application by Fred and Bebe Barnes for a permit to subdivide their parcel into four parcels. The County set forth numerous conditions on the approval of this "Minor Land Division" (MLD). One condition required compliance with the requirements of the sanitation district including "furnish[ing] a copy of the C.C. & R.'s to the District." Another condition read: "An agreement for shared maintenance of the private road, drainage facilities, sound wall, and all landscaping, including the area of scenic easement, shall be submitted and recorded with the Parcel Map." The MLD approval required the recordation of a parcel map by March 5, 1992. At the time of the conditional approval of the MLD, a tentative map was recorded setting forth the County's conditions and stating that the parcels were to be used for "Single Family Residence[s]."
The sanitation district conditioned the availability of sewer service to the proposed parcels on "form[ation of] a Homeowners' Association with ownership & maintenance responsibilities for all on-site sewers for this project; reference to same shall be included on the Final Map & in the Association's CC & R's. Provide copy of said CC & R's to District."
*148 In May 1991, the Barneses created Topsail by filing articles of incorporation. On February 26, 1992, the parcel map for the MLD was recorded after the County Surveyor determined that it conformed with state and local subdivision laws. No CC & Rs (covenants, conditions and restrictions) were recorded at that time, and the Parcel Map did not reference Topsail or any homeowners association. A road maintenance agreement between the Barneses and the adjoining Soquel Creek Homeowners Association for shared maintenance of an access road to the subdivision was recorded at the same time as the parcel map.
The Barneses constructed a house on one of the four parcels and began living there in 1994. In 1994, SCWD engaged an appraiser to determine the value of the three remaining unimproved parcels in the subdivision. SCWD intended to acquire one or more of the parcels as a site for a well and water treatment facility. The appraiser reported to SCWD that the three parcels "would be part of the homeowners association" and "[e]ach property is a participant of the homeowners association ...." In March 1995, after developing a preliminary site plan for a well and water treatment facility on "Parcel A," SCWD purchased "Parcel A" from the Barneses. The purchase contract between SCWD and the Barneses explicitly stated that the land was being acquired for a "Water Treatment Facility." The parties to this purchase contract agreed that "this sale was under threat of condemnation [by eminent domain]."
The members of Topsail purchased the three other parcels in 1997. It was disclosed to each of them in advance of their purchase that SCWD owned Parcel A. Nevertheless, the Barneses "provide[d] all prospective purchasers of the lots with copies of the documents relating to the Homeowners Association and CC & Rs." Bridget Grant, one of the members of Topsail, declared that, before she purchased her parcel in June 1997, she inquired of SCWD employee Jeff Gailey regarding SCWD's plans for Parcel A and he told her that SCWD intended to sell the parcel because it was unsuitable for SCWD's use. Grant asserted that she would not have purchased her parcel if she had known of SCWD's plans, and that she did not learn of those plans until "early 1998." Gailey declared that he had never told her any such thing and that SCWD had always intended to construct a well and water treatment facility on the parcel.
In October 1997, SCWD and the owners of the other three parcels entered into an agreement for shared maintenance of the private road serving the four parcels. At the same time, Grant sent a note to SCWD inquiring "if your construction will be consistent with the existing building envelope." In December 1997, SCWD notified Topsail that it would begin the design phase for its well and water treatment facility in the spring of 1998 and expected to complete construction within two years after it successfully complied with CEQA (California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.).
On May 8, 1998, Topsail recorded the CC & Rs that the Barneses had prepared but never recorded. Topsail amended these CC & Rs on December 21, 1998. These CC & Rs stated that "[n]o lot shall be occupied and used except for residential purposes...." The CC & Rs also provided that "[p]rior to the final closing of the first sale of a Lot in the Development, [the Barneses] shall convey to [Topsail] title and control of the Common Area...."
In 1998, SCWD commissioned an initial study for its planned well and water treatment facility on Parcel A. This study noted that the treatment process would remove iron and manganese from the well water and discharge the iron and manganese as "discolored water" in "relatively *149 low concentrations" into the sanitary sewer system. SCWD's other well and water treatment facilities operated under a "wastewater discharge permit" issued by the sanitation district. In June 1998, SCWD responded to a notice of a meeting of Topsail's board of directors by informing Topsail that its parcel was not subject to or bound by Topsail's actions.
SCWD planned to build its well and water treatment facility on Parcel A between April and October 1999. In March 1999, SCWD offered to enter into an agreement with the owners of the other three parcels for shared maintenance of the common areas in the subdivision. The proposed agreement was modelled after the 1997 road maintenance agreement between the same parties. SCWD stated that "the District remains completely and unequivocally willing to contribute its pro-rata share of the cost of maintaining the improvements." Topsail refused SCWD's offer as "unfair," and insisted that the only acceptable solution would be SCWD's agreement to be bound by the CC & Rs recorded by Topsail in 1998. SCWD refused to agree to be bound by those CC & Rs.

Procedural Background
In January 1999, Topsail sought a parcel legality determination from the County's Planning Department (the Department). It sought determinations that "the lots created [by the MLD] are illegal" and that SCWD was required to comply with state and local building and zoning laws. In March 1999, Topsail obtained a preliminary injunction from the superior court temporarily restraining SCWD from constructing its well and water treatment facility. In June 1999, the Department issued a determination that the lots "are legal" and did not require Certificates of Compliance because the recorded parcel map served as a Certificate of Compliance. The Department also determined that the parcels were in violation of the County's subdivision ordinances because the subdivider had failed to comply with the conditions on the MLD. The Department did not recommend that violation proceedings be initiated "at this time," but it noted that it would be "prudent" for the owners of the parcels to "record a maintenance agreement" for the common areas to remedy this deficiency.
Topsail filed an administrative appeal of the Department's determination to the Planning Director. On October 28, 1999, the Planning Director denied the appeal. He upheld the Department's conclusions, and he "strongly urged" the owners of the four parcels to reach an agreement to satisfy the unfulfilled MLD conditions. "Otherwise, the County may be forced to mail a Notice of Intention to Record a Notice of Violation to the property owners. Having a Notice of Violation recorded on the deeds of the four property owners could create difficulties in their abilities to refinance or sell their properties."
On December 14, 1999, Topsail filed a petition for a writ of mandate. Topsail alleged that the County had refused to "follow and enforce" state and local subdivision, zoning and wastewater discharge laws. It sought a writ of mandate (1) directing the County to issue unconditional certificates of compliance for the three parcels owned by its members and a conditional certificate of compliance for the parcel owned by SCWD conditioned on SCWD joining Topsail, (2) prohibiting the County from issuing any permits to SCWD for its proposed well and water treatment plant on its parcel until SCWD had joined Topsail, (3) compelling the County to record a new parcel map referring to Topsail and its CC & Rs and (4) compelling the County to require SCWD to obtain a development *150 permit and use permit and comply with all zoning ordinances with respect to its proposed well and water treatment project on its parcel and with respect to any other similar projects. Topsail also sought to compel the County to pay its legal costs and fees and administrative costs incurred in the administrative proceedings. Finally, Topsail asked for "general" and "exemplary" damages although it alleged no causes of action for damages.
The superior court issued an alternative writ of mandate and order to show cause setting a hearing for January 20, 2000. The County filed a demurrer to the petition in which it argued that the petition was barred by the statute of limitations in Government Code section 66499.37 and that the petition had failed to join an indispensable party, SCWD. The court sustained the demurrer with leave to amend with respect to the need to join SCWD, but it overruled the demurrer with respect to the statute of limitations.
On February 2, 2000, Topsail filed an amended petition adding SCWD as a respondent, and the court issued an amended alternative writ and order to show cause setting the matter for hearing on March 31, 2000. SCWD demurred to the amended petition based on the statute of limitations and moved to strike large portions of the amended petition on the same basis. The trial court overruled SCWD's demurrer and motion to strike. The County answered the amended petition. The County alleged as affirmative defenses that the petition was barred by the statute of limitations and that a writ of mandate could not be utilized to obtain an order "concerning future land use decisions" not involving the legality of the parcels. The County argued that the issue of SCWD's compliance with zoning and building ordinances was "not ripe for judicial review at this time." SCWD alleged that its facility was exempt from zoning ordinances under Government Code § 53091 because it would be a facility for the "production . . . of water."
After a hearing, the trial court granted the petition in part and denied it in part. The trial court found that the Barneses had not substantially complied with the MLD conditions. It concluded that Topsail's action challenging the legality of the parcels was not barred by the statute of limitations because Topsail was not contesting the approval of the parcel map but instead the Planning Director's parcel legality determination and further that the County Surveyor's approval of the parcel map "[did] not involve any discretionary decision making, but is merely a ministerial act" and therefore the 90-day statute of limitations was inapplicable. The court also determined that the CC & Rs recorded by Topsail did not bind SCWD's parcel and therefore SCWD was not precluded from utilizing its parcel for a non-residential use.
The court compelled the County to issue conditional certificates of compliance for all four parcels conditioned on Topsail's members and SCWD forming a "Property Owner's Association" (POA) with recorded CC & Rs governing shared maintenance of the common areas and sewers. The court reserved jurisdiction to resolve any disputes between SCWD and the members of Topsail regarding the formation of the POA and the agreement to CC & Rs. The court also compelled the County to record a new parcel map referencing the POA and its CC & Rs. SCWD was ordered to pay Topsail all delinquent assessments for maintenance of the common areas and sewers, and the County was ordered to reimburse Topsail for the administrative costs associated with the parcel legality determination.
*151 The trial court refused to compel SCWD to comply with building and zoning laws with respect to its proposed well and water treatment facility. It determined that SCWD's proposed well and water treatment facility was exempt from building and zoning laws under Government Code section 53091 because it was a facility "for the production, generation, storage, or transmission of water."
Topsail filed a timely notice of appeal from the court's judgment. The County filed a timely notice of cross-appeal from the judgment.

Discussion

A. Standard of Review
"In reviewing the trial court's ruling on a writ of mandate, the appellate court is ordinarily confined to an inquiry as to whether the findings and judgment of the trial court are supported by substantial, credible and competent evidence. [¶] This limitation, however, does not apply to resolution of questions of law where the facts are undisputed. In such cases, as in other instances involving matters of law, the appellate court is not bound by the trial court's decision, but may make its own determination. Statutory construction is such a question of law for the courts...." (Evans v. Unemployment Ins. Appeals Bd. (1985) 39 Cal.3d 398, 407, 216 Cal.Rptr. 782, 703 P.2d 122, citations omitted.) The questions before us in these appeals are purely questions of statutory interpretation and the facts are undisputed. We exercise de novo review on such questions. (Greenwood Addition Homeowners Assn. v. City of San Marino (1993) 14 Cal.App.4th 1360, 1367, 18 Cal.Rptr.2d 350.)

B. Statute of Limitations
The County contends that Topsail's petition was barred by the 90-day statute of limitations set forth in Government Code section 66499.37 insofar as Topsail sought to challenge the legality of the parcels because such a challenge is an attack on the County's 1992 approval of the parcel map.

1. Petition Challenged 1992 Parcel Map Approval
The initial issue is whether Topsail's petition actually presented a challenge to the County's 1992 approval of the parcel map which created the four parcels. Topsail claims that it has never challenged the 1992 approval of the parcel map but instead challenged only the County's 1999 parcel legality determination. The County, on the other hand, argues that Topsail's challenge to the legality of the parcels was necessarily a challenge to the 1992 approval of the parcel map. The County is correct.
"Final approval of parcel maps is vested in the County Surveyor." (Santa Cruz County Code § 14.01.330; see also Gov. Code, § 66450.) "After approval of a parcel map by the County Surveyor, he shall transmit the map to the Recorder." (Santa Cruz County Code § 14.01.333.) "A recorded . . . parcel map . . . shall constitute a certificate of compliance with respect to the parcels of real property described therein." (Gov.Code, § 66499.35, subd. (d).) A certificate of compliance certifies the legality of a parcel. (Gov.Code, § 66499.35, subds. (a), (b).) "The filing for record of a final or parcel map by the Recorder shall automatically and finally determine the validity of such map and when recorded shall impart constructive notice thereof." (Santa Cruz County Code § 14.01.339.)
Topsail's petition challenged the legality of the four parcels created by the 1992 parcel map on the ground that the Barneses had failed to comply with some of the *152 subdivision conditions. However, the County Surveyor approved the parcel map in 1992 finding that the conditions had been fulfilled. Although the County now concedes that the County Surveyor was in error in making that determination, Topsail cannot challenge the legality of the parcels without challenging the County Surveyor's erroneous 1992 approval of the parcel map since that approval established the legality of the parcels. Topsail claims that it is simply seeking to compel the County to enforce its conditions, but this claim actually reinforces the conclusion that Topsail's petition is challenging the County Surveyor's erroneous determination that the conditions had been fulfilled.[1] Topsail could only succeed if it established that the County Surveyor's determination was erroneous, which is necessarily a challenge to the County Surveyor's 1992 approval of the parcel map.

2. Parcel Map Approvals By County Surveyors Are Subject To The 90-Day Limitations Period
Topsail alternatively contends that the 90-day statute of limitations does not apply to a challenge to the approval of a parcel map by the County Surveyor because the County Surveyor is not an "advisory agency" and does not make a "decision" to approve a parcel map.
"Any action or proceeding to attack, review, set aside, void or annul the decision of an advisory agency, appeal board or legislative body concerning a subdivision, or of any of the proceedings, acts or determinations taken, done or made prior to such decision, or to determine the reasonableness, legality or validity of any condition attached thereto, shall not be maintained by any person unless such action or proceeding is commenced and service of summons effected within 90 days after the date of such decision. Thereafter all persons are barred from any such action or proceeding or any defense of invalidity or unreasonableness of such decision or of such proceedings, acts or determinations." (Gov.Code, § 66499.37, emphasis added.)
Santa Cruz County requires both a tentative map and a parcel map for any subdivision that creates four or fewer parcels. (Santa Cruz County Code § 14.01.201, subd. (b).) After a tentative map has been approved with conditions, the subsequent parcel map must substantially comply with those conditions. (Santa Cruz County Code § 14.01.330.) If a parcel map is "in substantial compliance" with an approved tentative map, the parcel map must be approved. (Santa Cruz County Code § 14.01.405.) The authority to approve pareel maps is vested in the County Surveyor. (Santa Cruz County Code § 14.01.330.) Once the County Surveyor has approved of a parcel map and it has been recorded, the final validity of the parcel map is "automatically" *153 established. (Santa Cruz County Code § 14.01.333; Santa Cruz County Code§ 14.01.339.)
Topsail argues that the County Surveyor is not an "advisory agency." "`Advisory agency' means a designated official or an official body . . . having the authority by local ordinance to approve, conditionally approve or disapprove maps." (Gov.Code, § 66415.) By Santa Cruz County Ordinance, the County Surveyor is the "designated official" who has the "authority" to "approve" parcel maps. (Santa Cruz Co. Ord. § 14.01.330.) It follows that we must reject Topsail's claim that the Santa Cruz County Surveyor is not an "advisory agency" with respect to the approval of parcel maps.
Topsail contends that the County Surveyor did not make a "decision" to approve the parcel map in 1992 but "merely took it upon himself to record the parcel map without verifying that the conditions imposed on the MLD had been met." While the County Surveyor's implicit determination that the conditions had been satisfied was erroneous, the mere fact that a determination is erroneous does not transform it into something other than a decision. While we do not disagree with Topsail's characterization of the Santa Cruz County Surveyor's approval of a parcel map as "ministerial" rather than "discretionary," the County Surveyor's lack of discretion does not dictate that his or her approval of a parcel map is not a "decision" within the meaning of Government Code section 66499.37.[2] (Kriebel v. City Council (1980) 112 Cal.App.3d 693, 703, 169 Cal.Rptr. 342; Great Western Sav. & Loan Assn. v. City of Los Angeles (1973) 31 Cal.App.3d 403, 410, 107 Cal.Rptr. 359; but see Save El Toro Assn. v. Days (1977) 74 Cal.App.3d 64, 69-70, 141 Cal.Rptr. 282.) The 90-day statute of limitations set forth in "section 66499.37 is not by its terms limited in application to quasi-judicial or discretionary decisions . . . [and applies even] [¶] . . . where the County allegedly exercised no discretion." (Kirk v. County of San Luis Obispo (1984) 156 Cal.App.3d 453, 460, 202 Cal.Rptr. 606.) The County Surveyor's 1992 approval of the parcel map was a "decision" by an "advisory agency" to which the 90-day statute of limitations applied.
Topsail argues that public policy does not favor application of the 90-day statute of limitations to a challenge to a County Surveyor's approval of a parcel map because this would permit the prior discretionary decision imposing conditions to "be avoided merely by staff overlooking or ignoring legitimate conditions of approval ...." "The policy favoring certainty of land use entitlements would be thwarted, and opportunities for corruption would be presented with every controversial project."
First of all, application of the 90-day statute of limitations to the County Surveyor's approval of a parcel map does not mean that such approvals are unchallengable but only that they must be challenged within that limitations period. Furthermore, and more importantly, we lack the power to impose restrictions on the statute that the Legislature did not choose to impose. "This court has no power to rewrite the statute so as to make it conform to a *154 presumed intention which is not expressed. This court is limited to interpreting the statute, and such interpretation must be based on the language used." (Seaboard Acceptance Corp. v. Shay (1931) 214 Cal. 361, 365, 5 P.2d 882.) "In interpreting statutes, we follow the Legislature's intent, as exhibited by the plain meaning of the actual words of the law, whatever may be thought of the wisdom, expediency, or policy of the act." (California Teachers Assn. v. Governing Bd, of Rialto Unified School Dist. (1997) 14 Cal.4th 627, 632, 59 Cal. Rptr.2d 671, 927 P.2d 1175, internal quotation marks omitted.)
The plain language of Government Code section 66499.37 unambiguously applies to a decision by the County Surveyor approving a parcel map. Topsail's public policy arguments to the contrary should be addressed to the Legislature, which has the power to amend the statute if it should decide that Topsail's arguments have merit.
Topsail did not initiate its action challenging the legality of the parcels until 1999. Clearly, the 90-day limitations period for challenges to the County Surveyor's 1992 decision had long since expired. Consequently, Topsail was barred from challenging the legality of the parcels. The trial court therefore erred in issuing a writ of mandate based on this challenge. It should have concluded that Topsail's action with respect to the legality of the parcels was barred by the statute of limitations and sustained the demurrers of the County and SCWD to this portion of the petition on this ground. The court's judgment granting the petition in part must be reversed.

C. A Water Treatment Plant Is Not Exempt From Zoning Laws
Topsail maintains that the trial court erroneously denied its petition to the extent that it sought to compel SCWD to comply with zoning laws with regard to the construction of its planned well and water treatment plant. SCWD and the County contend that zoning ordinances do not apply to the location and construction of a water treatment plant. The resolution of this dispute depends on the meaning of language in Government Code section 53091.
"Each local agency shall comply with all applicable building ordinances and zoning ordinances of the county or city in which the territory of the local agency is situated. [¶] . . . [¶] . . . Building ordinances of a county or city shall not apply to the location or construction of facilities for the production, generation, storage, or transmission of water, wastewater, or electrical energy by a local agency. [¶] . . . Zoning ordinances of a county or city shall not apply to the location or construction of facilities for the production, generation, storage, or transmission of water, or for the production or generation of electrical energy...." (Gov.Code, § 53091, emphasis added.)
The question before us is whether a water treatment plant is a "facilit[y] for the production, generation, storage, or transmission of water." Obviously, a water treatment plant is not a facility for the storage or transmission of water. Water may be stored in a tank or a reservoir and transmitted by pipes or canals, but a water treatment plant is not constructed for the storage or transmission of water. The only question is whether a water treatment plant is a facility for the "production" or "generation" of "water."
"In interpreting a statute where the language is clear, courts must follow its plain meaning. [Citation.] However, if the statutory language permits more than one reasonable interpretation, courts may *155 consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute. In the end, `"we must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences."'" (Torres v. Parkhouse Tire Service, Inc. (2001) 26 Cal.4th 995, 1003, 111 Cal.Rptr.2d 564, 30 P.3d 57.)
Government Code section 53091 (hereafter section 53091) has been construed but once before by the First District Court of Appeal in City of Lafayette v. East Bay Mun. Utility Dist. (1993) 16 Cal.App.4th 1005, 20 Cal.Rptr.2d 658 (EBMUD). As the First District noted, section 53091 "evinces a legislative intent to vest in cities and counties control over zoning and building restrictions, thereby strengthening local planning authority." (EBMUD at p. 1013, 20 Cal.Rptr.2d 658, emphasis added.) The general rule set forth in section 53091 is that building and zoning ordinances do apply to local agencies such as water districts. (EBMUD at p. 1013, 20 Cal.Rptr.2d 658.) Like us, the First District was called upon to construe the parameters of the exception for certain water facilities. The First District determined that section 53091 was intended to exempt from zoning only "the essential components of a water storage and transmission system." (EBMUD at p. 1014, 20 Cal.Rptr.2d 658.) Since the facility that EBMUD wished to construct was essentially a support facility, the First District held that it did not come with section 53091's zoning exemption. (EBMUD at p. 1014, 20 Cal.Rptr.2d 658.) "[I]t does not actually perform the function of generating, transmitting or storing water. We think that the absolute exemption of section 53091 was intended to be limited to facilities directly and immediately used to produce, generate, store or transmit water." (EBMUD at p. 1014, 20 Cal.Rptr.2d 658, emphasis in original.)
Our task is to determine whether the water treatment plant proposed by SCWD would actually, directly and immediately perform the function of producing or generating water. First we look at the plain meaning of the statutory language. The dictionary definitions of the words used in a statute are properly utilized to aid in determining the "plain meaning" of statutory language. (In re Do Kyung K. (2001) 88 Cal.App.4th 583, 592, 106 Cal.Rptr.2d 31.) "Production" and "generation" are synonymous as are "produce" and "generate." (Webster's Collegiate Diet. (10th ed.1993) p. 485.) Production means "the act or process of producing" while generation means "origination by a generating process." (Webster's Collegiate Diet. (10th ed.1993) pp. 485, 930.) "Produce" means "cause to have existence," "create," give "rise to" or "make." (Id. at p. 930.) "Generate" means "to bring into existence" or "to originate by a vital, chemical, or physical process." (Id. at p. 485.) "Water" means "the liquid that descends from the clouds as rain, forms streams, lakes, and seas." (Id. at p. 1334.)
If we were to rely solely on these dictionary definitions, we would reach the absurd conclusion that the exemption for facilities that produce or generate water applies only where the facility creates water molecules. Clearly the Legislature did not intend for its language to create an absurd inapplicable exemption. We have no doubt that the Legislature believed that a well "produces" groundwater by moving it from below ground to above ground.[3] Nevertheless, our assumption in *156 this regard does not resolve the more discrete question at issue here: did the Legislature also intend to exempt from zoning not only wells but also water treatment facilities. The plain language of the statute does not disclose the answer to this question. While the dictionary definitions of the words of the statute suggest that the words refer to the production of water in its natural untreated state, a broad interpretation of the statute's words might exempt facilities for the production of treated water.
Since the plain meaning of the statutory language is not apparent, we must resort to other indications of the Legislature's intent. The legislative history of Government Code section 53091 contains no indication of whether the Legislature intended to exempt from zoning facilities for the production of treated water.[4] Had the Legislature intended to exempt water treatment plants from zoning ordinances, it was clearly capable of explicitly referring to such plants in section 53091. Many statutes explicitly refer to drinking water or potable water. California's Safe Drinking Water Act is among the Legislature's enactments that explicitly reference both water treatment and drinking water[5]. This act states that a "public water system" includes "collection, treatment, storage, and distribution facilities...." (Health & Saf.Code, § 116275, subd. (h)(1).) The act also defines a "water treatment plant" as "a group or assemblage of structures, equipment, and processes that treat, blend, or condition the water supply of a public water system for the purpose of meeting primary drinking water standards." (Health & Saf.Code, § 116275, subd. (x).) If section 53091 exempted facilities for the production of drinking water, we would encounter little difficulty in concluding that the Legislature intended to exempt water treatment plants from zoning. The Legislature's failure to explicitly exempt such facilities leaves its intent less than apparent.
We are left with general rules of construction to guide us. "[Exceptions in a statute are to be strictly construed." (National City v. Fritz (1949) 33 Cal.2d 635, 636, 204 P.2d 7.) "In interpreting exceptions to the general statute courts include only those circumstances which are within the words and reason of the exception.... *157 One seeking to be excluded from the sweep of the general statute must establish that the exception applies." (Barnes v. Chamberlain (1983) 147 Cal. App.3d 762, 767, 195 Cal.Rptr. 417.) The general rule of section 53091 is that "[e]ach local agency shall comply with all applicable building ordinances and zoning ordinances ...." The limited exception is that "[z]oning ordinances of a county or city shall not apply to the location or construction of facilities for the production, generation, storage, or transmission of water ...." (Gov.Code, § 53091, emphasis added.) We must "strictly construe" the Legislature's exemption of "facilities for the production . . . of water."
We must also be guided by the entire statutory scheme of which section 53091 is a part. Section 53096 provides a means by which a local agency may exempt a facility "related to storage or transmission of water" from a zoning ordinance. (Emphasis added.) Facilities "related to storage or transmission of water" has been interpreted to mean "those [facilities] which have a 'connection with' and are in fact integral to the proper operation of particular storage and transmission functions of water districts." (EBMUD at p. 1015, 20 Cal. Rptr.2d 658.) Section 53096's provision for a local agency to exempt a project from zoning requires a noticed public hearing at which, by a four-fifths vote of the agency's board, the agency determines that there is no feasible alternative to the proposed project. (Gov.Code, § 53096.) Since facilities "for" storage or transmission of water are automatically exempt under section 53091, section 53096's provision for a means of obtaining a non-automatic exemption of facilities "related to" storage or transmission of water demonstrates that the Legislature did not intend for section 53091's automatic exemption to extend to facilities that simply have a "connection with" and are "integral to" the water production function of a water district.
We are unable to discern whether the Legislature actually intended to include a water treatment plant within section 53091's automatic exemption of facilities for the production of water. While we believe that the Legislature intended to include a well within section 53091's automatic exemption, the extension of the exemption to a water treatment facility involves policy considerations that we are unable to conclude that the Legislature resolved. The location of a well is determined by the location of the groundwater that the well seeks to extract. Thus, an exemption from zoning allows a water district to develop new water sources. A water treatment facility, on the other hand, does not necessarily need to be located at the source of the water. While water treatment may have a "connection with" and be "integral to" the production of drinking water and it may be the most efficient plan to locate a water treatment plant at the wellhead, only a liberal interpretation of section's 53091's automatic exemption from zoning would permit us to conclude that this exemption includes a water treatment facility. As exceptions from a general statute must be strictly construed, we are not permitted to adopt a liberal interpretation of section 53091's exception to the general rule that zoning applies to local agencies.
We must therefore hold that the trial court erred in ruling that SCWD's proposed water treatment plant was exempt from zoning under section 53091.

Disposition
The judgment is reversed. The trial court is directed to vacate its original order partially granting the petition and to enter a new order that (1) denies the petition insofar as it challenges the legality of *158 the four parcels and (2) grants the petition insofar as it seeks to compel SCWD to comply with zoning laws with respect to its proposed water treatment facility. The trial court shall issue a writ of mandate commanding SCWD to comply with zoning as to its water treatment facility. On remand, the trial court may reconsider its ruling on Topsail's request for attorney's fees. The parties shall bear their own appellate costs.
WE CONCUR: PREMO, Acting P.J., and ELIA, J.
NOTES
[1] Topsail claims public policy precludes application of any statute of limitations to its claim because doing so would encourage unscrupulous subdividers to ignore conditions of approval with impunity. Not so. While we do not discount the possibility that the County Surveyor may again err in determining that conditions have been fulfilled, an erroneous determination may be challenged during the limitations period, and the original subdivider may be held responsible for any misdeeds. "The Subdivision Map Act provides criminal sanctions against illegal subdividers and allows local governments control over such situations. But the act does not require innocent purchasers to suffer for the violations of the grantor or his predecessors." (Stell v. Jay Hales Development Co. (1992) 11 Cal.App.4th 1214, 1228, 15 Cal.Rptr.2d 220.) The Barneses, who were responsible for the failure to fulfill the conditions, are not involved in this action. Instead, Topsail seeks relief against SCWD, an innocent subsequent purchaser. Any public policy arguments that might be applicable to an illegal subdivider would not apply to SCWD.
[2] A "ministerial decision" is a decision that "involves only the use of fixed standards or objective measurements without personal judgment" while discretionary decisions require the utilization of personal judgment and generally involve basic policy decisions. (Cf. City of Los Angeles v. Amwest Surety Ins. Co. (1998) 63 Cal.App.4th 378, 386, 73 Cal. Rptr.2d 729; Tarasoff v. Regents of University of California (1976) 17 Cal.3d 425, 445, 131 Cal.Rptr. 14, 551 P.2d 334.)
[3] Unfortunately, the Legislature did not explicitly define what it meant by "facilities for the production . . . of water." An unrelated statute dealing with petroleum provides an example of how the Legislature might have explicitly provided a definition. This unrelated statute provided a definition of "production facility" as it was used there. "`Production facility' means piping or equipment used in the production, extraction, recovery, lifting, stabilization, separation, or treatment of petroleum or associated storage or measurement. (To be a production facility under this definition, piping or equipment must be used in the process of extracting petroleum from the ground and transporting it by pipeline.)" (Gov.Code § 51010.5, subd. (g).) By explicitly including "treatment" of petroleum in its definition, this statute avoided the problem that we confront here.
[4] The only information we have been able to discover in the history of this legislation that addresses this exemption is a single sentence in a letter from a supporter of the legislation to the Governor's Office. The League of California Cities stated that "[t]his [exemption] rests upon the commonly recognized physically required continuity of utility facilities." This sentence is neither helpful nor cognizable as evidence of the Legislature's intent. (California Teachers Assn. v. San Diego Community College Dist. (1981) 28 Cal.3d 692, 700, 170 Cal.Rptr. 817, 621 P.2d 856.)
[5] Another statute that explicitly refers to both treatment and potable water is Streets & Highways Code section 2808.5. It refers to "facilities for the production, treatment, storage, and distribution of water, which supply potable water for domestic, municipal, commercial, or industrial use...." (Emphasis added.)